Present: Hassell, C.J., Lacy, Koontz, Lemons, and Agee, JJ., and Carrico and Russell, S.JJ.

SELECT MANAGEMENT RESOURCES, LLC, ET AL.

OPINION BY
v.   Record No. 061168          SENIOR JUSTICE HARRY L. CARRICO
                                           April 20, 2007
THE RUNNYMEDE CORPORATION, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Randall D. Smith, Judge

At issue in this case is a provision in a lease dated November 8, 2004, between The Runnymede Corporation, as landlord, and Select Management Resources, LLC, as tenant, for the rental of a commercial building located in the City of Chesapeake.  The provision is found in Paragraph 18 of the lease and reads in pertinent part as follows:  "Tenant covenants not to make (or suffer to be made) any alterations or improvements therein or thereto . . . without prior written permission of Landlord, which approval shall not unreasonably be withheld."  The lease is for a term of five years commencing January 1, 2005, with the option of one three-year renewal.

Select Management Resources trades under the name of "LoanMax" and operates a loan office providing loans on automobile titles in the building leased from Runnymede.  The building is constructed of natural stone with off-white pebble trim.  On January 14, 2005, Select Management commenced to paint the exterior of the building bright yellow with red trim.

On March 8, 2005, after the paint job was completed, Runnymede sent a letter to Select Management stating that the latter had painted the exterior of the building without asking or receiving Runnymede's prior permission and was therefore in default under the terms of the lease. The letter further stated that unless the building was restored to its original state within 30 days, Runnymede would take necessary steps to correct the situation at Select Management's expense.

Select Management then asked that it "be allowed to leave the building exterior as it is currently painted until the lease expires, at which time [Select Management] would agree to restore it to its original state." Select Management did not offer to establish an escrow or otherwise guarantee the restoration of the premises. By letter dated March 31, 2005, Runnymede denied this request, "as there was no prior permission given by the Landlord for [Select Management] to paint the exterior of the building" and that Select Management was still in default and must restore the building to its original state within 30 days.

Select Management did not restore the building within the thirty-day period but on April 7, 2005, filed in the trial court a bill of complaint for injunctive and declaratory relief against Runnymede, requesting an injunction preventing Runnymede from holding Select Management in default or taking any legal

proceedings of default against Select Management. The bill also sought a declaration that the painting of the building was "a cosmetic change" and not "an alteration . . . pursuant to paragraph 18 of the Lease," or, if the painting was an alteration, that consent by Runnymede was unreasonably withheld.

At trial, Select Management presented evidence that it has some 200 loan offices across the country, including 24 in Virginia. The exterior walls of all freestanding offices are painted bright yellow with red trim. Select Management considers this color pattern important because it distinguishes LoanMax from its competitors and allows the public to easily identify the LoanMax brand. The building is located in a commercial district and stands between a McDonald's Restaurant on one side and a Dairy Queen Restaurant on the other. On the same street are a Jiffy Lube, a Rally's Hamburgers, and a Popeye's Chicken Restaurant. All these buildings have color schemes similar to that of LoanMax. There are no city restrictions that prohibit painting the building according to the LoanMax color scheme.

Runnymede introduced into evidence an estimate it had received from a contractor for the removal of the yellow paint from the stone and mortar joints and the repainting of the red trim with an off-white color. The yellow paint will have to be removed from the stone and mortar joints with chemicals and

water blasting, and the red paint on the trim will simply be coated over. The work will consume thirty days at a cost of $18,676.00. Runnymede also introduced into evidence color photographs of the building in its before-paint and after-paint state.

In a final order, the trial court found that Select Management's "painting of the building is an 'alteration' as that word is used and meant in the lease" and that Runnymede's "permission for the alteration has not been unreasonably withheld." The court denied Select Management's request for an injunction. We awarded Select Management this appeal.

On appeal, Select Management argues that the trial court erred in holding that the painting of the building constituted an alteration within the meaning of Paragraph 18 of the lease. Select Management says that painting the exterior of a building is cosmetic in nature, that the paint was readily removable from the building in question, and, hence, the painting of the building did not constitute an alteration requiring Service Management to seek the permission of Runnymede before doing the painting. Select Management also argues that if the painting was an alteration, Runnymede unreasonably withheld its consent.

Our cases provide only limited assistance in defining the term "alteration." We said in Bolin v. Laderberg, 207 Va. 795, 801, 153 S.E.2d 251, 256 (1967), that the word "alteration,"

4

when given its usual meaning and viewed in the context in which it is used in the lease, "can mean only something changed about the premises."

Black's Law Dictionary 85 (8th ed. 2004) defines the term as follows:

> A substantial change to real estate, esp[ecially] to a structure, usu[ally] not involving an addition to or removal of the exterior dimensions of a building's structural parts.  Although any addition to or improvement of real estate is by its very nature an alteration, real-estate lawyers habitually use *alteration* in reference to a lesser change.  Still, to constitute an alteration, the change must be substantial – not simply a trifling modification.

Other jurisdictions have considered the meaning of the term.  In Ten-Six Olive, Inc. v. Curby, 208 F.2d 117, 122 (8th Cir. 1953), it is said that an "[a]lteration denotes a substantial change."  See also Zelinger v. Plisek, 426 P.2d 957, 959-60 (1967); Rosenblum v. Neisner Bros., Inc., 231 F.2d 322, 326 (7th Cir. 1956).  In Garland v. Titan West Associates, 543 N.Y.S.2d 56, 60 (N.Y.App.Div. 1989), the court stated that "whether the improvements effectuated by plaintiffs constitute alterations turns on whether they changed the nature and character of the demised premises."  And in Leong Won v. Snyder, 94 N.Y.S.2d 247, 249 (1949), the court defined the term as applied to a building to mean "a substantial change therein varying or changing the form or nature of such building."

5

In short, for a change in a building to constitute an alteration, the change must be substantial, not trifling. It must be one that alters the nature and character of the building.

We would agree with Select Management that, ordinarily, the painting of the exterior of a building is merely cosmetic in nature and not an alteration in the legal sense. But this is not an ordinary situation. Here, the trial judge would have needed to take only one look at the graphic before and after photographs of the building to find that the change caused by the painting was substantial, not trifling, resulting in a change in the nature and character of the building. What once had the appearance of a stately stone building has been given the mark of crass commercialism, which can only be erased with the expenditure of a significant sum of money.

That the effect of the alteration was substantial may be demonstrated by reference to a rule applicable to landlord-tenant cases. A tenant who performs work on leased premises not authorized by the lease is guilty of committing waste. See Roanoke Marble & Granite Co. v. Standard Gas & Oil Supply Co., 155 Va. 249, 257, 154 S.E. 518, 521 (1930); see also Rosenblum, 231 F.2d at 325. Here, the rental for the building in the year the painting occurred was $2,925.00 per month. According to the estimate secured by Runnymede, it will cost Runnymede $18,676.00

6

to restore the building to its original state, the equivalent of more than six months' rent, an amount which, by any measure, demonstrates the substantial nature of the alteration of the premises made by the tenant in this case without permission.

The painting of the building, therefore, constituted an alteration requiring the prior permission of Runnymede.  And, under the circumstances of this case, because Select Management did not seek permission prior to undertaking the painting, it is in no position to claim that the permission was unreasonably withheld.

Finding no error in the proceedings below, we will affirm the judgment of the trial court.

Affirmed.